## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| PEGAS BACCAS AND<br>GARY ATTZS,<br><br>　　　　　　　　　　*Plaintiffs,*<br><br>　　*v.*<br><br>NISSAN OF NEW ROCHELLE;<br>PANA NISSAN LLC d/b/a NISSAN<br>OF NEW ROCHELLE;<br>PAGA NISSAN LLC d/b/a NISSAN<br>OF NEW ROCHELLE;<br>ANTHONY PANARELLA<br>TD AUTO FINANCE, LLC.<br><br><br>　　　　　　　　　*Defendants.* | **COMPLAINT**<br><br><br>**JURY TRIAL<br>DEMANDED**<br><br>Civ. Action No: _____ |

## <u>INTRODUCTION</u>

1.　　Plaintiffs Pegas Baccas and Gary Attzs, individual consumers, bring this action for money damages, injunctive relief, and declaratory judgment, seeking redress for unlawful practices relating to his purchase and financing of an automobile.

2.　　Plaintiffs allege violations of the Truth In Lending Act, 15 U.S.C. §§ 1601 *et seq.* ("TILA"), Federal Equal Credit Opportunity Act ("ECOA") 15 U.S.C. § 1691, *et seq.*, the New York Motor Vehicle Retail Instalment Sales Act, N.Y.P.P.L. § 301

1

*et seq.*, New York General Business Law § 349 and § 350, and New York's usury laws.

3.     Plaintiff also asserts a common law claim for fraud.

## JURISDICTION AND VENUE

4.     This Court has jurisdiction pursuant to 15 U.S.C. § 1640 (TILA) and 15 U.S.C. § 1691e (ECOA).

5.     This Court has authority to issue a declaratory judgment pursuant to 28 U.S.C. § 2201 and § 2202.

6.     This Court has supplemental jurisdiction over the Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

7.     Venue in this District is proper under 28 U.S.C § 1391 because a substantial part of the events and omissions complained of took place in this District and the Defendant auto dealership maintains offices, transacts business, and is otherwise found in this district.

## THE PARTIES

8.     Plaintiff Pegas Baccas lived in Brooklyn New York when the events set forth herein occurred, and now resides in Florida.

9.     Plaintiff Gary Attzs is and at all relevant times has been a resident of Brooklyn, New York.

10.     Defendant Nissan of New Rochelle ("the Dealership") is the entity listed as the seller of the vehicle at issue on both the retail instalment agreements referenced in the instant complaint and is the trade name of the auto dealership located in Westchester County that sold Plaintiffs the Vehicle.   Nissan of New Rochelle is not listed in the New York Secretary of State's database of active businesses.

11.     Defendant Pana Nissan LLC is a business whose principal place of business is located in Westchester County and is a domestic limited liability company registered with the New York Secretary of State.

12.     Upon information and belief, Pana Nissan LLC does business as Nissan of New Rochelle.

13.     Some of the relevant documents described herein list the seller as "Paga Nissan LLC" not "Pana Nissan LLC".  Out of an abundance of caution, Plaintiffs name Paga Nissan LLC as a separate defendant.

14.     Paga Nissan LLC is, to the extent it is not simply Defendant Pana Nissan LLC misspelt in certain transaction documents, a business whose principal place of business is located in Westchester County and, upon information and belief, is united in interest with the Dealership.

15.     Anthony Panarella is the owner and general manager of the Dealership and, upon information and belief, is the owner and principle of each of the other Defendants listed above as united in interest with the Dealership.  Mr. Panarella

and all other defendants in this matter but for TD Auto Finance, LLC are hereafter referred to as the Dealership Defendants.

16.    As set forth below, the exact relationship between each of the Dealership Defendants is not yet clear, nor is it clear which are bonafide business entities and which are aliases of one another.

17.    Defendant TD Auto Finance, LLC ("TD Auto" or "the Bank") is a financial institution incorporated under the laws of Michigan.

## FACTS

18.  Plaintiff Baccas started working as a service technician for the Dealership in September 2013.

19. The Dealership does not appear in the New York Secretary of State's database of active businesses.

20.  Mr. Baccas' paystubs list Defendant Pana Nissan LLC as his employer.

21.  In April 2016, while employed by the Dealership, Mr. Baccas noticed a 2010 Landrover Range Rover in the shop, and asked his boss, Anthony Panarella, the owner/general manager of the dealership what the sale price of the vehicle was.

22. On or about April 19, 2016,  Mr. Panarella told Mr. Baccas that he could purchase the vehicle for $31,000.

23.  He and Mr. Panarella agreed on this price and moved on to discussing financing.

24. Mr. Panarella ran Mr. Baccas credit and told him his credit was too low to obtain a loan on his own and that he would need a co-signer or a family member to be the borrower.

25. The Dealership did not, at that time or at any time after that, provide Mr. Baccas with any paperwork regarding his credit denial or the reasons for same.

26. Mr. Baccas "Credit karma" account shows that the Dealership made the credit inquiry referred to above.

27. The dealership next checked Mr. Baccas' father's credit.

28. The dealership informed Mr. Baccas that his father's credit was also insufficient.

29. Again, the Dealership did not at that time or at any time after provide paperwork regarding the credit denial or reasons for same.

30. Mr. Baccas then reached out to his father-in-law, Plaintiff Gary Attzs and asked for his assistance in financing the vehicle.

31. Mr. Attzs asked Mr. Baccas if he trusted his employer to treat him and Mr. Baccas fairly and keep its word.

32. Mr. Baccas, who had known Mr. Panarella for many years prior to his employment with the Dealership, assured his father in law that the dealership was trustworthy.

33. Provided with Mr. Baccas' assurances, Mr. Attzs agreed to have his name on the loan documents and Mr. Baccas then provided the Dealership with Mr. Attzs' information (SSN, date of birth, employment information, etc.).

34. Mr. Baccas informed Bruce Green in the Dealership's finance office that his monthly budget for car payments was $600 to $650.

35. Bruce informed Mr. Baccas that this was workable and would not be a problem.

36. Bruce then informed Mr. Baccas that Mr. Attzs was approved at $691.00 per month and that to proceed, Mr. Baccas would need to put $1000 down and Mr. Attzs would need to come into the office on May 2, 2016 at 7:30 PM.

37. Mr. Baccas informed Bruce that he would not have $1000 on May 2, 2017 but would have it shortly thereafter.

38. Bruce told Mr. Baccas that this was not an issue and that Mr. Attzs should nonetheless come in and sign.

39. Mr. Attzs is not sophisticated in financial matters and relied on his knowledge that his son-in-law and his son-in-law's employer had agreed on a sales priced of $31,000 and monthly payments of $691.

40. Mr. Attzs signed a Retail Instalment Contract on May 2, 2017 (hereafter, the "Non-Forged RIC") but was not provided with a copy of any paperwork at all.

41. The Dealership informed Mr. Baccas that paperwork would be provided when Mr. Baccas paid the $1,000 downpayment.

42. The Non-Forged RIC lists Defendant Nissan New Rochelle as the seller-creditor.

43. Mr. Baccas was asked to leave the room while Mr. Attzs signed the papers.

44. Specifically, he was asked to perform the statutorily required NYS inspection on the Vehicle.

45. Mr. Baccas presented Bruce with the downpayment on May 3, as agreed.

46. At that time, Bruce provided him with an envelope containing the Non-Forged RIC.

47. Mr. Baccas was shocked to see that the Non-Forged RIC contained dramatically more expensive terms than those on which he had agreed with the Dealership, as well as a dramatically higher monthly payment.

48. Specifically, the Non-Forged RIC provided for a cash price of $42,075.00 for the Vehicle, and an extended warranty of $5000.00.

49. The amount of total other products financed is listed as $5,362.00.

50. Although the Non-Forged RIC does not disclose any additional products beyond the extended warranty, Mr. Attzs informed Mr. Baccas that the Dealership had mentioned to him that he was purchasing various additional products as part of the transaction, including "Key Replacement", "Maintenance", and "Tire Wheel".

51. The Non-Forged RIC lists a monthly payment of $849.55.

52. On May 3, 2016, Mr. Baccas confronted the sales representative who had been assigned to the vehicle sale, as neither Bruce nor Mr. Panarella were available, informing the sales representative that the Non-Forged RIC did not accurately reflect his agreement.

53. The sales representative claimed he "didn't know" and told Mr. Baccas that he would need to discuss the issue with Mr. Panarella and/or Bruce Green.

54. On May 4, Mr. Baccas confronted Bruce, who informed him that he "had nothing to do with it" and that Mr. Baccas would need to speak with Mr. Panarella.

55. Mr. Baccas called Mr. Panarella and after receiving no answer, texted him regarding the issue.

56. Mr. Panarella told Mr. Baccas to meet him at 6 PM on May 5, 2016.

57. When he arrived at that time, he was told to come back in 20 minutes as Mr. Panarella was "busy".

58. When he came back in 20 minutes, he was told to come back later as Mr. Panarella was "still busy".

59. The following, Mr. Baccas attempted to see Mr. Panarellaagain and was told by Mr. Panarella to "come and see me later".  Mr. Baccas came by later that day and again was not permitted to meet with Mr. Panarella.

60. This pattern repeated itself regularly for roughly 10 days, with Mr. Baccas attempting to set up meetings and also sending Mr. Panarella texts stating that

he did not have any of the various auxiliary product contracts and agreements for which he had been charged.

61. On  May 17, 2017 when Mr. Baccas met with Mr. Panarella.

62. Mr. Panarella showed Mr. Baccas a purported "original" retail instalment contract (hereafter, the "Forged RIC") listing out various itemized charges, and provided Mr. Baccas with a copy of same.

63. The Forged RIC contains Mr. Attzs' forged signature.

64. The amounts listed on the Forged RIC do not match the amounts listed on the Non-Forged RIC previously provided to Mr. Baccas by Bruce.

65.  For example, the Forged RIC shows a lower cash price ($37,949 as opposed to $42,075.00), a lower APR 6.59 % as opposed to 6.89 %), a lower finance charge ($9462.14 as opposed to 9633.30), a higher Amount Financed ($47,812 vs. $46,437).

66.  Notably, the Forged RIC shows starkly higher additional product expenses, listing the "Security Plus" extended warranty for $6,375, "Key Replacement" of $1,000; "Maintenance" of $1125.57; and "Tire Wheel" of $2,000.

67.  Thus, while the non-forged RIC provided for "Total Other Charges" of $5,362, the Forged RIC provides for "Total Other Charges of $10,862.57.

68.  The Forged RIC also contained a monthly payment of $867.79 (higher than the Non-Forged RIC's payment of 849.55, much less the agreed upon $691, much less the originally promised $600-650).

69.  At the  May 17th meeting, Mr. Panarella, stated that he would "cross out" the various service plans other than the extended warranty, and, in front of Mr. Baccas, crossed them out.

70. Mr. Panarella agreed to return $4200 which appears to the aggregate price listed on the Forged RIC for Key Replacement, Maintenance and Tire Wheel.

71.  Mr. Panarella and Mr. Baccas agreed that Mr. Baccas would keep the extended warranty.

72.  Notably, as stated above, the Dealership Defendants increased the cost of this product from $5,000 to $6,375 on the Forged RIC.

73.  This still left Mr. Baccas and Mr. Attzs responsible for paying a loan on a vehicle that had been promised for $31,000 but sold to them and financed for much more.

74.  Aware that he was being defrauded, but fearing for loss of his job and worried about his ability to provide for his wife and three children, Mr. Baccas decided not to press further at the time.

75. On or around August 30, 2016, Mr. Baccas experienced issues with the Vehicle's air conditioning system and immediately contacted the extended service company, S Guard (upon information and belief, a subdivision or otherwise related entity of Santander Consumer USA) regarding same.

76. S Guard, informed Mr. Baccas that they did not see him, his vehicle or his policy in the system.

77. Mr. Baccas informed Mr. Panarella of the problem and eventually received from him a copy of a service contract with S Guard.  The contract listed the price of the extended warranty as $2800 (not $5000 as listed on the Non-Forged RIC and not $6375 as listed on the Forged RIC).

78.  The service contract listed the Seller of the Vehicle as PARA NISSAN LLC. No such entity is listed in the New York Secretary of State's database of active businesses.

79. Mr. Baccas then contacted the warranty company again on September 8, 2016.

80. The warranty company informed Mr. Baccas that although they now saw him in the system, they could not assist because the dealership had never paid for the policy and thus the policy was not active.

81.  Mr. Baccas eventually became financially unable to make the $869 monthly payments on the vehicle and Mr. Attzs eventually the Bank and told it to take back the vehicle.

82. The vehicle was repossessed on or about April 4, 2017.

83. To the best of Plaintiffs' knowledge, the vehicle has not been sold or otherwise disposed of.

84. Mr. Baccas subsequently moved to Florida with him family.

85. Defendants conduct, including defrauding Mr. Baccas in front of his co-workers, and involving his in-laws in a financially ruinous transaction, has

caused Mr. Baccas depression, extreme embarrassment, stress, and emotional distress.

86.  Indeed, Mr. Baccas moved to Florida in significant part to put the episode behind him.

87.  On or about April 25, 2017, S Guard again confirmed to Mr. Baccas that it had never been paid for and thus never provided Mr. Baccas with the extended service warranty.

## COUNT I
## TRUTH IN LENDING ACT, 15 §§1601 et seq. ("TILA")

88.    Plaintiffs repeat and re-allege and incorporate by reference the foregoing paragraphs.

89.    The Dealership, to whom the Forged and Non-Forged RIC's are payable on their face, regularly extended or offered to extend consumer credit for which a finance charge is or may be imposed or which, by written agreement, is payable in more than four installments.

90.    The Dealership is a creditor within the meaning of the TILA, 15 USC § 1602(f) and the relevant implementing regulations set forth in Regulation Z (e.g. § 226.2(a)).

91.    The Bank purports to be an assignee of the Dealership and demanded and accepted payments under one or both RICS on that basis.

92.    As such, the Bank is an assignee pursuant to TILA, 15 U.S.C. § 1641(a) and the relevant implementing regulations found in Regulation Z.

93.    The RICs list a motor vehicle, an article of personal property, as collateral.

94.    The RICs are a written agreement payable in more than four installments.

95.    The RICs are consumer credit transaction within the meaning of the TILA, 15 USC § 1602, and Regulation Z § 226.2.

96.    The finance charges indicated on the RICs exceed $1,000.

97.    Prior to the purported consummation of the RICs, Plaintiff was not provided with the TILA disclosures in a form that he, as a consumer, could keep, nor in any form at all.

98.    Plaintiffs were not provided disclosures that conform with the obligations under the TILA and Regulation Z.

99.    The RICs violate multiple provisions of TILA inasmuch as:

a.    The costs of credit, including the true cash price, APR, amount financed, finance charge, and monthly payment, as well as the true cost of the various third party products foisted upon Plaintiffs were not clearly and conspicuously disclosed;

b.    The various increases in cost over the agreed upon price of $31,000 were incurred incident to the extension of credit and is, therefore, a "finance charge" as defined under TILA § 1605(a) and Regulation Z § 226.4(a).

c.    Plaintiffs were not provided with timely disclosures.

100.   As a result of Defendants' failure to include these as finance charges, the sale price, finance charge, amount financed, and APR disclosed in the retail installment contract are all materially misstated, in violation of TILA § 1638(a) and Regulation Z §226.18.

101.   Defendants thereby violated TILA, 15 USC § 1638 and Regulation Z §§ 226.17, 226.18.

102.    Had the true costs of the transaction been accurately and timely disclosed, Plaintiffs would not have proceeded with the purchase and financing of the vehicle and the harms set forth herein would not have occurred.

103.   The Bank is liable for these violations pursuant to TILA, 15 U.S.C. 1641, governing TILA liability of assignees.

104.   As a result of these TILA violations, Plaintiffs are entitled to actual damages, statutory damages, costs and attorney's fees.

## COUNT II
## FEDERAL EQUAL CREDIT OPPORTUNITY ACT ("ECOA")
## 15 U.S.C. § 1691, *et seq.*

105.   Plaintiffs repeat, re-allege and incorporate by reference the foregoing paragraphs.

106.   As set forth above, the Dealership informed Plaintiff Baccas that his credit was insufficient to purchase the Vehicle.

107.   This action constituted a denial of credit.

108.   The failure to provide to Plaintiff Baccas any written statement of reasons for the denial of credit to Plaintiff and to provide the disclosures mandated by 15 U.S.C § 1691(d) (2) (b) violated the ECOA.

109.   As a result of the above alleged ECOA violations, Plaintiffs have suffered substantial actual damages, including imposition of higher costs for the Vehicle's purchase and financing, the loss of his rights to determine the basis for credit denial, loss of the credit itself, frustration, anger, and embarrassment.

110.   As a result of the above alleged ECOA violations, Defendants are liable to Plaintiffs for statutory damages, actual damages, punitive damages of $10,000.00 against each Defendant pursuant to 15 U.S.C. § 1691e(b) and for attorney's fees and costs pursuant to 15 U.S.C. § 1691e(d).

## COUNT III
## NEW YORK MOTOR VEHICLE
## RETAIL INSTALLMENT SALES ACT § 302, et seq. (MVRISA)

111.   Plaintiffs repeat and re-allege and incorporate by reference the foregoing paragraphs.

112.   The Plaintiff is a "retail buyer" within the meaning of MVRISA § 301(2).

113.   The Dealership is a "retailer seller" within the meaning of MVRISA § 301(3).

114.   The transaction as described above involved a "retail instalment sale" within the meaning of MVRISA § 301(4).

115.   MVRISA expressly incorporates all TILA disclosure requirements.

116.   As set forth above, none of these disclosures were provided at the time of consummation of the sale of the Vehicle.

117.   As set forth above, the RICs provided to Plaintiffs, to the extent they were provided at all, were in gross violation of TILA's requirements.

118.   For all of the reasons stated herein, under MVRISA § 307, Defendants, including the Bank, are barred from recovering any credit service charge, delinquency, or collection charge on the RIC and Plaintiffs are entitled to costs and attorney's fees.

## COUNT IV
## USURY

119.   Plaintiffs repeat and re-allege and incorporate by reference the foregoing paragraphs.

120.   Pursuant to General Obligations Law § 5-501, the legal rate of interest in New York is "six per centum per annum unless a different rate is prescribed in §14-a of the Banking Law." Section 14-a (1) provides: "The maximum rate of interest provided for in section 5-501 of the general obligations law shall be sixteen per centum per annum."

121.   Defendants obscured the actual rate of interest charged and the total amount financed by hiding additional interest as costs within the purchase.

122.   In reality, the increase in the cash price of the vehicle showing on the RIC and/or the cost of the additional mandatory products and charges are finance charges that should have been disclosed as such in the contract.

123.   When these charges are added to the incomplete finance charge, the total finance charge is well over the both the civil usury rate of 16% and New York's criminal usury rate of 25% (New York Penal Law, Section 190.40).

124.   Pursuant to NYGOL § 5-501 and New York Penal Law 190.40 and 190.42, the alleged interest is therefore usurious, and the creditor forfeits both principal and interest due on the transaction.

125.   As a result of Defendants' violations, Plaintiff is entitled to a declaratory judgment that her obligation to Bank, the purported assignee of the loan made by the Dealership, is void, and are entitled to damages in the amount of all principal, interest, fees and other charges paid on the auto loan to date.

## COUNT V
## NEW YORK GENERAL BUSINESS LAW § 349
## (DECEPTIVE CONSUMER PRACTICES)

126.   Plaintiffs repeat and re-allege and incorporate by reference the foregoing paragraphs.

127.   Each of the deceptive acts and practices set forth above constitutes a violations of NYGBL § 349 independent of whether these acts and practices constitute violations of any other law.

128.   These deceptive acts and practices were committed in conduct of business, trade, commerce or the furnishing of a service in this state.

129.   Each of these actions was consumer oriented and involves misleading conduct that is recurring and has a broad impact upon the public, or, in the alternative, such misleading practices are the types that could easily recur, could potentially impact similarly situated consumers, and are therefore consumer-oriented and harmful to the public at large.

130.   The Dealership's conduct and statements were materially misleading.

131.   As a result of these violations of NYGBL §349, Plaintiff suffered actual damages as set forth above.

132.   The Dealership's violations were willful and knowing and committed in bad faith.

133.   For these reasons, Plaintiff is entitled to actual damages as set forth above, three times the actual damages up to $1000, punitive damages, attorney's fees, costs and declaratory judgment that the Dealership's practices are deceptive in violation of § 349.

## COUNT VI
## FRAUD

134.   Plaintiff repeat, re-allege and incorporate by reference the foregoing paragraphs.

135.   As set forth above, the Dealership defrauded Plaintiffs, *inter alia*, by using a variety of predatory tactics to increase the price of the Vehicle beyond the agreed to $31,000 and by means of the Forged RIC.

136.   As set forth in detail herein, the Dealership's representations regarding the price of the Vehicle, the additional products, the monthly payments required and the cost of financing were all materially false.

137.   The Dealership intended to deceive Plaintiffs.

138.   Plaintiffs believed and justifiably relied upon the Dealership's representations.

139.   Had the Dealership been truthful about the sales terms and the contents of the RIC and had the Dealership not made these fraudulent misrepresentations, Plaintiffs would not have purchased the Vehicle.

140.   As a result of such reliance, Plaintiffs sustained actual damages (including both pecuniary and non-pecuniary damages).

141.   Moreover, the Dealership's conduct was egregious on every level; it was a virtually larcenous scheme.

142.   As a result of Plaintiffs reasonable reliance upon the Dealership's misrepresentations, Plaintiffs are entitled to actual damages as set forth above, punitive damages, and costs.

WHEREFORE, Plaintiffs respectfully demand judgment against Defendants as follows:

a.   COUNT I, TRUTH IN LENDING ACT, judgment against Defendants for statutory damages, actual damages, attorney's fees, litigation expenses and costs, declaratory judgment that they have violated TILA and Regulation Z, and such other or further relief as the Court deems appropriate;

b.   On COUNT II, Equal Credit Opportunity Act ("ECOA"), judgment against Defendants, statutory damages, actual damages, punitive damages, reasonable attorney's fees, costs and expenses, and declaratory judgment that Defendants have violated ECOA;

c.   On COUNT III, VIOLATIONS OF MVRISA, declaratory judgment against Defendants that they have violated MVRISA and an order barring recovery of any credit service charge, delinquency, or collection charge under the RIC and disgorging all such monies paid to date, as well as reasonable attorney's fees and costs of the action;

d.   On COUNT IV, USURY, declaratory judgment that Plaintiff's Vehicle loan is void, actual damages in the amount of all principal, interest, fees, and charges paid and such other and further relief as the Court deems appropriate;

e.   On COUNT V, NYGBL § 349, judgment against Defendants, injunctive relief, actual damages, three times the actual damages up to $1,000, punitive damages, costs and reasonable attorney's fees, declaratory judgment that Defendants have engaged in deceptive conduct, and such other or further relief as the Court deems appropriate;

f.   On COUNT VI, FRAUD, judgment against Defendants, actual damages, punitive damages, and costs;

g.   Such other and further relief as law or equity may provide.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff demands a trial by jury as to all issues so triable.

Dated:        May 1, 2017

Respectfully Submitted,

*s/Daniel A. Schlanger*
Daniel A. Schlanger
Kakalec & Schlanger, LLP
85 Broad Street, 18th Floor
New York, New York 10004
T:  212.500.6114
F:  646.612.7996
dschlanger@kakalec-schlanger.com

*Attorneys for Plaintiff*